INTERNATIONAL GENERAL ELECTRIC PUERTO RICO, INC., demandante y recurrida, *v.* SECRETARIO DE HACIENDA, demandado y recurrente.

*Número:* R-73-263     *Resuelto:* 31 de mayo de 1978

468

*Miriam Naveira de Rodón, Procuradora General, Federico Rodríguez Gelpí, Procurador General Auxiliar,* abogados del recurrente; *Trías, Francis, Doval, Colorado & Carlo* y *Rogelio Muñoz, Jr.,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR MARTÍN emitió la opinión del Tribunal.

Este caso plantea dos cuestiones relativas a la Ley de Contribuciones sobre Ingresos de Puerto Rico de 1954. La primera se contrae a determinar quién es el contribuyente a los efectos de beneficio de arrastre de pérdidas a la luz de lo dispuesto en las Secs. 23 y 122 de la referida ley. La segunda cuestión envuelve la interpretación de cuándo el método de contabilidad utilizado por el contribuyente refleja claramente el ingreso conforme lo dispone la Sec. 41 de la citada ley.

# I

Los hechos esenciales que surgen del récord con respecto a la primera cuestión quedan resumidos a continuación.

La International General Electric, Sociedad Anónima, Inc. (en adelante IGESA), corporación organizada bajo las leyes del Estado de Nueva York, fue autorizada a hacer negocios en Puerto Rico [1] en 1944 donde efectuó operaciones hasta 1958, a través de una sucursal.

En 1958 IGESA decidió organizar una corporación bajo las leyes de Puerto Rico con el nombre de International General Electric Puerto Rico, Inc. (en adelante IGE-PR) para llevar a cabo los negocios que hasta entonces realizaba a través de la sucursal. Dicha corporación puertorriqueña habría de adquirir sustancialmente todos los activos que aparecían en los libros de la sucursal de Puerto Rico y asumiría a la vez sus obligaciones a cambio de acciones comunes de la nueva corporación con un valor equivalente a la suma de "capital asignado" más el sobrante que reflejaran los libros de contabilidad de dicha sucursal. En su consecuencia IGE-PR continuaría los negocios que antes efectuaba IGESA y ésta cesaría sus operaciones en Puerto Rico.

A los fines de dejar aclarada la responsabilidad contributiva que podría surgir con motivo del mencionado traspaso de las operaciones de la sucursal a la nueva corporación, IGESA obtuvo una opinión (*ruling*) del Secretario de Hacienda que autorizaba la reorganización de los negocios de IGESA en la forma ya explicada quedando librada del pago de contribuciones sobre ingresos en Puerto Rico con motivo de la reorganización. [2] La opinión del Secretario de Hacienda contiene las siguientes determinaciones:

---

[1] También realizaba negocios a través de sucursales en Colombia y Venezuela.

[2] Igualmente obtuvo IGESA una opinión del Departamento del Tesoro Federal que declaraba que la propuesta reorganización de IGESA no estaría sujeta a responsabilidad contributiva federal. Dicha opinión es extensiva a la subsiguiente liquidación y distribución de todos los activos

1. La propuesta reorganización no es en cumplimiento de un plan que tiene como uno de sus principales propósitos el evitar las contribuciones sobre ingresos del Estado Libre Asociado de Puerto Rico dentro del significado de la sección 112(i) de la Ley de Contribuciones sobre Ingresos de Puerto Rico de 1954.

2. No se reconocerá ganancia o pérdida a IGESA al consumarse la propuesta reorganización bajo las disposiciones de las secciones 112(b) (4), 112(b) (5), y 112(g) (1) (D) de la Ley de Contribuciones sobre Ingresos de Puerto Rico de 1954, siempre y cuando se cumplan los requisitos estatutarios.

3. La corporación de Puerto Rico (IGE-PR) que habrá de ser organizada como parte del plan de reorganización asumirá y será responsable de cualquier obligación de IGESA al Estado Libre Asociado de Puerto Rico.

Luego de completada la descrita reorganización IGE-PR continuó las operaciones de la anterior sucursal de IGESA en Puerto Rico manteniendo la misma estructura administrativa y distributiva. IGESA no llevó a cabo más ninguna operación de negocios en Puerto Rico después de la reorganización y varias semanas después renunció a su autorización para hacer negocios en la Isla, habiendo sido disuelta como entidad corporativa en el Estado de Nueva York dentro del mismo año 1958.

La sucursal de IGESA en Puerto Rico, por constituir una corporación extranjera dedicada a negocios localmente, rindió planillas de contribuciones sobre ingresos durante el tiempo en que estuvo activa a base del ingreso bruto de fuentes dentro de Puerto Rico. 13 L.P.R.A. secs. 3013, 3015, 3231(b) (c). Conforme lo establece la ley tiene derecho a reclamar las deducciones contra el ingreso bruto hasta el límite en que aquéllas están relacionadas con el ingreso producido de fuentes dentro de Puerto Rico, y además al beneficio de los créditos aplicables. 13 L.P.R.A. secs. 3232(a), 3233.

---

de IGESA a la corporación madre International General Electric, la que pasaría a ser dueña de las acciones de las corporaciones de Puerto Rico, Venezuela y Colombia.

Entre las deducciones permitidas está la pérdida neta en operaciones, 13 L.P.R.A. secs. 3023(s)(1), 3122(b)(2), la cual puede retrotraerse al año contributivo anterior, y cualquier remanente puede ser arrastrado a años contributivos subsiguientes hasta un máximo de cinco años. 13 L.P.R.A. sec. 3122.

A la fecha de la reorganización, en junio de 1958, la sucursal de IGESA en Puerto Rico transfirió a IGE-PR, unas pérdidas en operaciones sufridas anteriormente. IGE-PR incluyó dichas pérdidas en su planilla de contribución sobre ingresos correspondiente al segundo semestre del año contributivo 1958 y a los años contributivos 1959 y 1960 reclamando su derecho al arrastre en los últimos años mencionados por ser corporación sucesora de la sucursal de IGESA en Puerto Rico. El Secretario de Hacienda rechazó el arrastre de las pérdidas y notificó a IGE-PR unas deficiencias contributivas para los años 1959 y 1960, [3] las que fueron confirmadas después de la correspondiente reconsideración administrativa y fijadas en $680,906.57. La contribuyente prestó la fianza requerida y acudió al Tribunal Superior, el que dejó sin efecto todas las deficiencias impuestas. El Secretario de Hacienda acudió ante nos en revisión. Accedimos a revisar por considerar que las cuestiones planteadas son noveles en nuestra jurisdicción.

 ■  De entrada cabe decir que una corporación extranjera que ha sido autorizada de acuerdo con las leyes de Puerto Rico para realizar negocios aquí puede reclamar, lo mismo que un individuo, la igual protección de las leyes y el debido procedimiento de ley que reconoce la Sec. 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. Véase

---

[3] Las deficiencias notificadas incluían además las surgidas por razón del método de contabilidad, alegadamente inadecuado, utilizado por la contribuyente para computar el ingreso generado por los cargos de financiamiento de las ventas a plazos. Luego le fueron notificadas deficiencias adicionales para 1961 y 1962 por este último concepto. Las deficiencias por esta razón están discutidas en la parte II de esta opinión.

*Buscaglia, Tes.* v. *Tribunal de Contribuciones*, 64 D.P.R. 602 (1945). Le es aplicable por ende la disposición constitucional que exige que la imposición de contribuciones será uniforme en Puerto Rico. Art. VI, Sec. 3, Constitución del Estado Libre Asociado de Puerto Rico. Por consiguiente la contribución sobre ingresos debe ser igual para las corporaciones domésticas y para aquellas extranjeras que se hubieren domiciliado en Puerto Rico mediante el procedimiento de obtener autorización para hacer negocios dentro de esta jurisdicción. *Buscaglia, Tes.* v. *Tribunal de Contribuciones*, supra.

A base de las disposiciones legales citadas precedentemente IGESA hubiera tenido el derecho de reclamar el derecho de arrastre de pérdidas que concede la Ley de Contribuciones sobre Ingresos de Puerto Rico de 1954, si hubiera optado por permanecer haciendo negocios en Puerto Rico tal y como lo había hecho hasta el año 1958. Su subsiguiente reorganización que comprendió el traspaso de sus activos y pasivos a una nueva corporación puertorriqueña no afectó el derecho de ésta al arrastre de pérdidas en años subsiguientes. Veamos la disposición de la Ley que provee sobre el método de arrastre:

"Si para cualquier año contributivo comenzado después del 31 de diciembre de 1953 *el contribuyente* tuviere una pérdida neta en operaciones, la misma será una pérdida neta en operaciones a arrastrarse a cada uno de los 5 años contributivos siguientes . . . ." (Énfasis suplido.) 13 L.P.R.A. sec. 3122(b)(2).

El historial legislativo del citado precepto legal revela el testimonio del Secretario de Hacienda ante la Comisión de la Cámara de Representantes al efecto de que la retrotracción y arrastre de pérdidas netas en operaciones es una de las disposiciones liberalizadoras de mayor importancia para el desarrollo económico de Puerto Rico por ofrecer a una entidad que sufre pérdidas en un año determinado la oportunidad de recuperarlas, hasta donde sea posible, de sus ganancias ha-

bidas en el año anterior o durante los cinco años futuros. (⁴) Añadió el Secretario que esa disposición sigue estrictamente el lenguaje de la Ley Federal. (⁵)

La controversia gira alrededor del significado del término "el contribuyente" que aparece en la Sec. 122 de nuestra Ley de Contribuciones sobre Ingresos citada precedentemente. Esto envuelve la determinación de si la nueva entidad corporativa que reclama el arrastre de pérdida es el mismo contribuyente que la entidad que la sufrió.

El concepto de "el contribuyente" se analizó por el Tribunal Supremo de los Estados Unidos en *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1956). La interpretación que han dado los tribunales federales a aquellas disposiciones de la Ley Federal de Contribuciones sobre Ingresos que son similares a las nuestras tienen un valor persuasivo que nos ayuda a definir el contenido de las nuestras. Allí se trataba de una corporación, Libson Shops Management Corporation, que proveía servicios de administración a 16 corporaciones dedicadas a la venta de artículos de mujer, pertenecientes a los mismos accionistas que la primera. Cada corporación rendía su planilla de contribución sobre ingresos separadamente. Todas las 17 corporaciones se consolidaron en una sola, quedando los accionistas originales como dueños de la nueva corporación en la misma proporción que antes poseían. El efecto de la consolidación fue el de convertir 16 negocios de ventas al detalle y 1 negocio que proveía servicios de gerencia en una sola entidad que rendiría una sola planilla de contribuciones sobre ingresos. Tres de las dieciséis corporaciones de ventas tenían pérdidas acumuladas antes de la consolidación y continuaron sufriendo pérdidas después. El Gobierno argumentaba que el privilegio estatutario de arrastre de pérdidas no está disponible a menos que la corporación que lo re-

---

(⁴) Transcripción vistas Comisión de Hacienda de la Cámara, celebradas en 29 y 30 de junio de 1953, págs. 23, 24–26, 28 y 30.

(⁵) *Ibid.*

clama sea la misma entidad contributiva que la que sufrió la pérdida. Y, que en ese caso la nueva corporación no puede ser la misma entidad que las que antes operaron separadamente. En otras palabras, El Gobierno sostiene que para tener derecho al privilegio debe haber una "continuidad de la empresa mercantil." De no haberse realizado la consolidación, ninguna de las tres corporaciones con pérdidas hubiera tenido la oportunidad de arrastrarlas toda vez que no tuvieron ingresos que les permitieran absorberlas. De permitirle el arrastre después de la consolidación le ofrecería a las 16 corporaciones la oportunidad a la que renunciaron al rendir una planilla consolidada. El Tribunal Supremo concluyó allí que el ingreso de las entidades contra el que se reclamaban las pérdidas arrastradas no fue producido por entidades de negocios sustancialmente similares a las que sufrieron las pérdidas. El fundamento de la decisión citada encuentra apoyo en el historial legislativo de la Sec. 122 de la ley federal, equivalente a nuestra Sec. 122 (13 L.P.R.A. sec. 3122), al incorporarse aquélla al Código Federal de Rentas Internas de 1939. El Informe del Comité de Medios y Arbitrios de la Cámara de los Estados Unidos expresa que el permitir el arrastre de pérdidas sería de gran ayuda a los negocios y de estímulo a nuevas empresas, especialmente aquellas cuyos ingresos estaban sujetos a grandes fluctuaciones. De otra forma, añade el Informe, los negocios con ganancias y pérdidas variables tendrían que pagar mayores contribuciones que aquellos con resultados más o menos estables, aun cuando el promedio de ganancias en uno y otro caso sean iguales. H.R. Rep. No. 885, 76th Cong., 1st Sess. 9. Entendió el Tribunal Supremo en el caso de *Libson* que el historial legislativo de las disposiciones sobre arrastre de pérdidas reflejaba la intención congresional de que se aplicaran al mismo negocio. Véase *Libson*, supra, pág. 387. En otras palabras, dice *Libson* que dichas disposiciones no fueron diseñadas para permitir que se promediaran las pérdidas pre-consolidación de un negocio con el ingreso post-consolidación de otros negocios que estaban fun-

cionando y tributaban separadamente antes de la consolidación. Concluye el Tribunal Supremo diciendo que el historial a la mano sugiere que el Congreso estaba fundamentalmente interesado en el ingreso fluctuante de un solo negocio.

En efecto el caso de *Libson* reconoció la doctrina enunciada antes en la jurisdicción federal que exigía la continuidad de la empresa mercantil. Se cita allí con aprobación lo expresado por un circuito federal al resolver el caso de *Stanton Brewery, Inc.*, infra, al decir que las corporaciones allí fusionadas operaron "esencialmente una empresa contínua, acreedora a todos los . . . beneficios [de las disposiciones sobre arrastres] de aminorar lo que de otra forma serían severas consecuencias de ganancias fluctuantes o de expansión de negocios." Véanse *Newmarket Manufacturing Co.* v. *United States*, 233 F.2d 493 (C.C.A. 1st 1956) ; *E. & J. Gallo Winery* v. *Commissioner*, 227 F.2d 699 (1955) ; *Stanton Brewery, Inc.* v. *Commissioner*, 176 F.2d 573 (C.C.A.2d, 1949) ; *Koppers Co.* v. *United States*, 133 Ct. Cl. 22, 134 F.Supp. 290 (1955) ; *Net Operating Loss Carryovers and Corporate Adjustment*, Comment, 69 Yale L.J. 1201 (1960).

■ Entendemos y así lo resolvemos que la doctrina que requiere la continuidad de la empresa mercantil, a los fines de reconocer el arrastre de pérdidas de un negocio contra los ingresos del mismo negocio después de efectuarse una reorganización como la del caso de autos, debe reconocerse en esta jurisdicción. No tenemos duda de que el negocio operado por la sucursal de IGESA en Puerto Rico es el mismo que continuó siendo operado por IGE-PR, y por tanto ambas entidades deben considerarse como el mismo contribuyente, y por consiguiente deben extendérsele a esta última los beneficios de arrastre de pérdidas a que tenga derecho al amparo de las Secs. 3023 y 3122 del Título 13 de las *Leyes de Puerto Rico Anotadas*. Notamos, sin embargo, que en la opinión emitida por el Departamento del Tesoro de los Estados Unidos a IGESA en 10 de abril de 1958 se hace la salvedad de que ésta

no transfiere a las nuevas corporaciones, que incluye la IGE-PR, los derechos de la primera a un reembolso de contribuciones sobre ingresos federales que tiene pendiente. Habiendo reconocido que la corporación sucesora IGE-PR es el mismo contribuyente que la sucursal antecesora surge la posibilidad de que el reintegro aludido sea en alguna medida atribuible a las operaciones anteriores de la sucursal de IGESA de Puerto Rico, y que por ende el producto del reintegro pueda aminorar las pérdidas que se propone arrastrar IGE-PR a años anteriores. El Secretario de Hacienda debe tener la oportunidad de examinar la situación a fin de determinar si ello puede afectar el derecho a arrastre de IGE-PR.

## II

La segunda cuestión a resolver es si el sistema de contabilidad utilizado por la contribuyente al declarar el ingreso por concepto de cargos de financiamiento sobre sus ventas a plazos es un método corriente y aprobado de contabilidad "que [refleja] con claridad el ingreso" en tal forma que "las partidas de ingreso bruto y todas las deducciones [son] tratadas de manera razonablemente consecuente" según lo requieren las Secs. 3041 a 3044 del Título 13 de las Reglas y Reglamentos promulgados bajo la Ley de Contribuciones sobre Ingresos. 13 L.P.R.A. secs. 3041–3044; 13 R.&R.P.R. secs. 3041–3044.

IGE-PR se dedica a la venta de enseres eléctricos al contado y a plazos. Las ventas a plazos que son las que están envueltas en este pleito se contabilizan como ingreso en el momento de otorgarse el contrato de venta condicional a base del precio de venta del enser en cuestión más el 22% de los cargos por el financiamiento total que habría de cobrarse durante el período de vida del contrato. El resto del cargo por financiamiento, o sea el 78%, quedaba diferido y se distribuía a través de la duración del contrato de manera que la porción proporcional recibida como parte de cada plazo men-

sual se contabilizaba como ingreso al recibirse el pago del plazo mensual.

El sistema de contabilidad utilizado por el contribuyente aparece descrito en detalle en las conclusiones de hechos del tribunal de instancia, a saber:

"Las ventas a plazos son ventas a clientes que desean financiar su compra a través de un período de tiempo, por lo cual se le cobra cierta suma de dinero que se conoce como cargos por financiamiento. En estos casos, al momento de firmar el contrato de venta, se le reducía del precio de venta el pronto pago que se le exigía al comprador para llegar a la cantidad que se iba a financiar, cantidad sobre la cual se le cobraban cargos por financiamiento. Las entradas que se efectuaban en los libros al momento de la venta son las siguientes: un cargo a 'cuentas por cobrar a plazos' por la cantidad a financiar más los cargos por financiamiento, otro cargo a cuenta 'cash' representando el pronto pago recibido, un crédito a 'ventas' por el precio de venta del artículo y otro crédito a 'ingreso diferido' por la cantidad que representaba los cargos de financiamiento. También se acredita 'inventario' y se hace un cargo a 'costo de venta'. De ese modo se contabiliza el ingreso bruto producido por la venta inmediatamente. Del ingreso de financiamiento que se contabiliza en la cuenta nominada 'ingreso diferido' el 22% se llevaba a ingreso inmediatamente al efectuarse la venta con el propósito de lograr un pareo propio y adecuado de ingresos y gastos, ya que al adquirir la cuenta usualmente se incurre en gastos que normalmente son mayores que los que posteriormente se generan en el cobro y seguimiento de los pagos mensuales. La diferencia del 78% se llevaba a ingreso a medida que iba transcurriendo el tiempo que representaba el término del contrato financiado y se cobraban los plazos. Las entradas a esos efectos se hacían mensualmente basadas en una fórmula estimada que se aplicaba a la cuenta de 'ingresos diferidos' reconociéndose así mensualmente el ingreso de financiamiento que surgía de los pagos recibidos mensualmente (T.E. 3 de abril de 1972 págs. 321 a 325 y 335–338; Exhibit BB de la parte demandante).

La fórmula que se utilizaba para reconocer mensualmente los cargos de financiamiento diferidos se estableció en base a estudios realizados por la parte demandante, donde se analizaron los gastos en que incurrían sus departamentos de crédito y de cuen-

tas para establecer crédito a un cliente. Tenía la intención principalmente de lograr un pareo adecuado de ingresos y gastos y trataba de determinar qué cantidad en dólares en términos de por ciento representaban aquellos gastos de adquirir la cuenta que sin duda eran normalmente mayores que los de manejar la cuenta posteriormente (T.E. 23 de mayo de 1972 págs. 28–36, Exhibit BB de la parte demandante).

Con relación a los cargos por financiamiento que se cobraban a los clientes por financiar su compra, si estos decidían pagar anticipadamente sus cuentas, la demandante reducía del balance de la misma aquella cantidad que representaba cargos de financiamiento por el término del tiempo a financiar que el cliente no utilizó, esto es, por el ingreso de financiamiento no ganado por haber saldado el cliente su cuenta anticipadamente. Se eliminaba de la cuenta del cliente aquella cantidad de ingresos diferidos por concepto de financiamiento que nunca se ganaría por no prestarse el servicio, mediante un crédito a 'cuentas por cobrar' y un cargo a 'ingresos diferidos' por dicha cantidad. El mismo procedimiento se utilizaba por la parte demandante en casos de reposesiones. De esta manera la parte demandante eliminaba de la cuenta de ingresos diferidos y de la cuenta del cliente todo el ingreso de financiamiento no ganado. Por lo tanto, al momento de recibir el pago del cliente por la cantidad que finalmente representaba [la] liquidación de su cuenta se hacía necesario hacer entradas en los libros para dejar en cero la cuenta del cliente. Además, en aquellos casos donde por equivocación el cliente pagaba cargos de financiamiento no ganados, éstos eran reembolsados al cliente (T.E. 9 de noviembre de 1971, sesión de la tarde págs. 9–10; T.E. 3 de abril de 1972 págs. 178, 327–332; Exhibits AA y DD de la parte demandante; T.E. 3 de abril de 1972 págs. 174–238).

La práctica seguida por la demandante de diferir el ingreso de financiamiento hasta tanto transcurriera el tiempo y se recibieran los pagos, era una práctica comercial general en Puerto Rico seguida por otros negocios relacionados con la venta de productos a plazos. Igualmente era la costumbre en Puerto Rico concederles a los clientes un rembolso de los cargos de financiamiento no devengados en caso de pagar anticipadamente su cuenta (T.E. 3 de abril de 1972 págs. 15–20 y págs. 327–328).

El sistema de contabilidad descrito anteriormente ha sido utilizado consistentemente tanto por IGESA como por la deman-

dante para contabilizar el ingreso que percibieron en sus operaciones comerciales de la venta de sus productos y su financiamiento (T.E. 3 de abril de 1972 págs. 234–235). El mismo refleja exacta, clara y razonablemente el ingreso de la aquí demandante de acuerdo a los principios de contabilidad generalmente aceptados (T.E. 3 de abril de 1972 págs. 21–26). El hecho de que se reconozca aquella parte del ingreso de financiamiento diferido en el mes en que se cobra el plazo y no al momento de efectuarse la venta no deja de reflejar adecuadamente el ingreso de la IGEPR puesto que surge un efecto compensatorio año tras año (T.E. 18 de septiembre de 1972 págs. 233–234)."

Ya en 1958 el sistema de contabilidad de IGESA había pasado por el crisol de una investigación del Departamento de Hacienda que cubrió los años 1956 a 1958, como resultado de la cual se aceptó la práctica de diferir el ingreso de financiamiento en la forma y manera que ahora impugna el Secretario de Hacienda. Igual ocurrió en 1968 al investigar los libros de la contribuyente para los años 1964 a 1967. Sin embargo, en la investigación realizada en 1964 en conexión con una solicitud de reintegro de contribuciones sobre ingresos respecto a los años 1959 a 1962, el Secretario de Hacienda rechazó por primera vez el método de contabilidad utilizado por la contribuyente para declarar el ingreso generado por los cargos de financiamiento de sus ventas a plazos en esos años.

La tesis del Secretario es al efecto de que el ingreso diferido por concepto de financiamiento a través de la duración del contrato debe ser informado y reconocido por la contribuyente en el momento en que se lleva a cabo la venta a plazos, y que al no hacerlo así no está declarando correctamente sus ingresos y gastos. La falla del Secretario es que no ofrece evidencia alguna ni razonamiento interpretativo de la Ley o del Reglamento que ponga al Tribunal en condiciones de hacer su determinación sobre el particular.

La Ley de Contribuciones sobre Ingresos provee que un contribuyente puede computar su ingreso neto (1) a base de su período anual de contabilidad y (2) de acuerdo con

el método de contabilidad regularmente utilizado por el contribuyente para llevar sus libros. 13 L.P.R.A. sec. 3041. La ley permite generalmente dos métodos de contabilidad—el de recibido y pagado y el de acumulación, y permite además otros métodos siempre y cuando en opinión del Secretario "refleje claramente el ingreso". Entre esos métodos se encuentra el de ventas a plazos utilizado por traficantes en bienes muebles. Este último método contempla el declarar en cualquier año contributivo como ingreso "aquella proporción de los pagos a plazos realmente recibidos en ese año que la ganancia bruta realizada, o a ser realizada al completarse el pago total, guarde con el precio total del contrato" *Id.*, sec. 3044. Este método se utilizará en la forma en que el Secretario prescriba por reglamento. Véase 13 R.&R.P.R. sec. 3044-1. Dispone el reglamento que si el vendedor por razones de práctica consecuente opta por declarar el ingreso de sus ventas a plazos sobre la base de acumulación estricta o de recibido y pagado, tal procedimiento es admisible. *Id.*, sec. 3044-1(e).

■ Aunque la contribuyente no se acogió estrictamente a las disposiciones de la Sec. 3044, demostró haber seguido de cerca los lineamientos de la Sec. 3041 que le permite cierta autonomía en la determinación del sistema de contabilidad que adopte siempre y cuando pueda determinarse "a la luz de la regla fundamental de que la determinación tendrá que hacerse de tal modo que refleje con claridad el ingreso del contribuyente." Es indudable que la determinación ha de hacerse "de modo tal que, en opinión del Secretario, refleje con claridad dicho ingreso." Para ello, todas las partidas de ingreso bruto y todas las declaraciones han de ser tratadas de manera razonablemente consecuente. La contribuyente en el caso de autos ha demostrado su asiduidad y consistencia en el método seguido desde el año 1956 con el beneplácito del Secretario de Hacienda. El Secretario no ha demostrado la irrazonabilidad del método ni su falta de consistencia, y mucho

menos el que no refleje con claridad el ingreso de la contribuyente. Es imprescindible que el Secretario pruebe afirmativamente que dicho método de contabilidad no refleja adecuadamente los ingresos de la contribuyente. *Glenn* v. *Kentucky Color & Chemical Co., Inc.*, 186 F.2d 975 (1951); *Huntington Securities Corporation* v. *Busey*, 112 F.2d 368 (1940); *Harden* v. *Comm.*, 223 F.2d 418 (1955).

*Por los motivos expuestos se dejará sin efecto la sentencia dictada por la Sala de San Juan del Tribunal Superior de 30 de julio de 1973, y se devolverá el caso al tribunal de instancia para la celebración de una vista para determinar si el derecho que tenía IGESA pendiente a un reembolso de contribuciones sobre ingresos federales a la fecha en que organizó a IGE-PR aminoraban en alguna medida las pérdidas que IGE-PR se propone arrastrar a los años contributivos objeto de este pleito.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau se inhibieron. El Juez Asociado Señor Torres Rigual no intervino.